1996–NMSC–067

930 P.2d 792

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Foster James BREIT, Defendant–Appellant.**

**No. 21954.**

Supreme Court of New Mexico.

Dec. 6, 1996.

Lamberton & Riedel, Hilary Lamberton, Santa Fe, for Appellant.

Tom Udall, Attorney General, M. Anne Wood, Assistant Attorney General, Santa Fe, for Appellee.

## OPINION

FRANCHINI, Justice.

[1] Foster James Breit was convicted for aggravated assault with a deadly weapon and the first-degree murder of Colvin Hill. However, the court granted a motion for a new trial because of extreme prosecutorial misconduct. Breit was convicted on retrial and sentenced to life in prison. On double-jeopardy grounds, we reverse the convictions and discharge Breit from any further prosecution in this matter.

[2] Double jeopardy has been held to bar a new trial when a defendant is goaded by prosecutorial misconduct to move for a mistrial. *Oregon v. Kennedy,* 456 U.S. 667, 679, 102 S.Ct. 2083, 2091, 72 L.Ed.2d 416 (1982); *United States v. Kessler,* 530 F.2d 1246, 1255 (5th Cir.1976). In New Mexico, the rule barring reprosecution applies in those situations in which "the prosecutor engaged in any misconduct for the purpose of precipitating a motion for a mistrial, gaining a better chance for conviction upon retrial, or subjecting the defendant to the harassment and inconvenience of successive trials." *State v. Day,* 94 N.M. 753, 757, 617 P.2d 142, 146, *cert. denied,* 449 U.S. 860, 101 S.Ct. 163, 66 L.Ed.2d 77 (1980). The federal standard, described by the U.S. Supreme Court in *Oregon v. Kennedy,* restricts the bar against retrial exclusively to those situations in which the prosecution intentionally "goads" the defendant into moving for a mistrial. *Oregon v. Kennedy,* 456 U.S. at 676, 102 S.Ct. at 2089. Under the *Kennedy* standard, Breit's reprosecution would not have been barred.

[3] However, so pervasive and outrageous was the misconduct of the prosecutor in Breit's first trial that we are compelled to join other states in concluding that the narrow *Kennedy* rule based solely on prosecutorial intent does not adequately protect double-jeopardy interests. We do not overrule *Day* in this opinion. Rather, we interpret *Day* to be describing instances of misconduct in which the prosecutor acts in willful disregard of the resulting mistrial, retrial, or reversal on appeal. Under this standard, the reprosecution of Breit is barred.

## I. FACTS AND PROCEEDINGS

[4] Breit was charged with shooting and killing Hill in Alamogordo, New Mexico on September 1, 1988. Breit claimed he shot in self-defense.

[5] Breit's first conviction was set aside because of extreme prosecutorial misconduct. During the first trial, before the case went to the jury, Breit, through his attorney, expressed great concern about the actions of the prosecutor. He indicated the only proper solution might be the granting of a mistrial. However, since he had already endured the ordeal and expense of the entire trial, he chose to hear the jury's determination. Upon the guilty verdict, Breit filed a motion for a new trial which was granted.

[6] Thereafter, Breit filed a motion to dismiss all the charges on double-jeopardy grounds. The trial court granted this motion by memorandum opinion. *State v. Breit,* No. CR–88–175, slip op. at 1–11 (N.M.Dist.Ct. Aug. 2, 1990) [hereinafter *Breit I* ]. The state's motion to reconsider the dismissal was denied in a second memorandum opinion. *State v. Breit,* No. CR–88–175, slip op. at 2 (N.M.Dist.Ct. Sept. 12, 1990) [hereinafter *Breit II* ]. The state appealed the dismissal of the charges and the Court of Appeals reversed, stating that a new trial would pose no double-jeopardy violation. *State v. Breit,* No. 12,638, slip op. at 1–5 (N.M.Ct. App. Sept. 25, 1991) [hereinafter *Breit III* ]. We denied Breit's motion for certiorari. *Breit v. State,* 113 N.M. 1, 820 P.2d 435 (1991) [hereinafter *Breit IV* ].

[7] Breit was convicted in a second trial and sentenced to life imprisonment. Under the New Mexico Constitution we directly receive all appeals of sentences of life imprisonment. N.M. Const. art. VI, § 2 (Repl. Pamp.1992). On appeal, we address only one of the six issues raised by Breit. We conclude that double jeopardy should have

barred Breit's second trial and precludes his further prosecution.

## II. DOUBLE JEOPARDY AND PROSECUTORIAL MISCONDUCT

### A. *KENNEDY, DAY,* AND THE NARROW PROSECUTORIAL–INTENT STANDARD

■ [8] The New Mexico Constitution, like its federal counterpart, protects any person from being "twice put in jeopardy for the same offense." N.M. Const. art. II, § 15 (Repl.Pamp.1992); *see also* U.S. Const. amend. V. The double-jeopardy clause protects defendants from being subjected to multiple prosecutions for a single infraction. *State v. Tanton,* 88 N.M. 333, 336, 540 P.2d 813, 816 (1975).

[9] The words of Justice Black are often quoted to explain the interests protected by the double-jeopardy clause.

The underlying idea, one that is deeply ingrained in at least the Anglo–American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Green v. United States,* 355 U.S. 184, 187–88, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957). However, there is no "guarantee to the defendant that the State will vindicate its societal interest in the enforcement of the criminal laws in one proceeding." *Oregon v. Kennedy,* 456 U.S. at 672, 102 S.Ct. at 2087. Breit argues that, because of the nature of the prosecutorial misconduct in his first trial, the double-jeopardy clause of the New Mexico Constitution should have barred further prosecution in his second trial. We agree.

■ [10] The State contends that under the law-of-the-case doctrine we cannot address this issue. As noted above, the trial court's determination that double jeopardy barred the reprosecution of Breit was reversed by the Court of Appeals. *Breit III,* slip op. at 1–5 (reversing *Breit I* ). We denied Breit's motion for certiorari. *Breit IV,* 113 N.M. 1, 820 P.2d 435. Under the law-of-the-case doctrine, "[i]f an appellate court has considered and passed upon a question of law and remanded the case for further proceedings, the legal question so resolved will not be determined in a different manner on a subsequent appeal." *Ute Park Summer Homes Ass'n, Inc. v. Maxwell Land Grant Co.,* 83 N.M. 558, 560, 494 P.2d 971, 973 (1972).

■ [11] The most expedient response to this argument is that under New Mexico law, "[t]he defense of double jeopardy may not be waived and may be raised by the accused at any stage of a criminal prosecution, either before or after judgment." NMSA 1978, § 30–1–10 (Repl.Pamp.1994). The right to be protected from double jeopardy is so fundamental, that it cannot be relinquished even if a conviction is affirmed on appeal.

■ [12] Furthermore, the law-of-the-case doctrine is not inflexible. Rather, it is a matter of precedent and policy; it is a determination that, in the interests of the parties and judicial economy, once a particular issue in a case is settled it should remain settled. *See Reese v. State,* 106 N.M. 505, 507, 745 P.2d 1153, 1155 (1987) (quoting 5 Am.Jur.2d *Appeal and Error* § 750 at 194 (1962)). But we will not apply this doctrine to perpetuate an obvious injustice or to affirm a former appellate decision that is clearly erroneous. *Id.* The law-of-the-case doctrine is discretionary to this Court. In this case, application of the doctrine would be manifestly unjust.

■ [13] We emphasize, also, that our denial of Breit's petition for review of the double-jeopardy decision of the Court of Appeals suggested nothing as to the correctness of that court's decision. *See State v. Kennedy,* 295 Or. 260, 666 P.2d 1316, 1318 (1983). "[S]ince this court will not grant review whenever it appears that the Court of Appeals reached a questionable decision, it follows that a denial of review carries no implication that the decision or the opinion of the Court of Appeals was correct." *1000*

*Friends v. Board of County Comm'rs,* 284 Or. 41, 584 P.2d 1371, 1372 (1978). Appellate courts sometimes find themselves reexamining a denial of certiorari. In *United States v. Ohio Power Co.,* so that a case might be disposed of consistently with other cases involving the same question, the United States Supreme Court vacated, sua sponte, its order denying a petition for rehearing, even though nearly a year and a half had elapsed since denial of certiorari. 353 U.S. 98, 77 S.Ct. 652, 1 L.Ed.2d 683 (1957). In justifying its action the Court explained, "We have consistently ruled that the interest in finality of litigation must yield where the interests of justice would make unfair the strict application of our rules." *Id.* at 99, 77 S.Ct. at 653. Appellate courts have the power, in exceptional situations, to recall one of their own mandates after it has issued. *Lindus v. Northern Ins. Co.,* 103 Ariz. 160, 162, 438 P.2d 311, 313 (1968); *see also Maryland Casualty Co. v. Hallatt,* 326 F.2d 275, 276–77 (5th Cir.) ("We recognize that an appellate court's power to depart from its own ruling on a former appeal should be exercised sparingly and only in exceptional cases."), *cert. denied,* 377 U.S. 932, 84 S.Ct. 1335, 12 L.Ed.2d 296 (1964). This case is exceptional. Upon Breit's first petition for certiorari, the conduct of the prosecutor should have been examined.

■ [14] This opinion focusses on trials that are terminated, nullified, or reversed at the defendant's behest, not mistrials that are declared sua sponte by the court. The general rule is that when a defendant, on his or her own motion, obtains a mistrial, reprosecution is permitted. *Kessler,* 530 F.2d at 1255. However, when a defendant's mistrial motion or request for reversal on appeal is necessitated by prosecutorial misconduct, reprosecution may be barred. *Id.* Though not at fault, defendants in such situations must choose between two equally objectionable alternatives: they must either relinquish the opportunity of having their fate determined by the jury first impaneled and endure the expense and anxiety of a second trial, or they must continue with a proceeding that has been prejudiced by prosecutorial misconduct. *United States v. Dinitz,* 424 U.S. 600, 608, 96 S.Ct. 1075, 1080, 47 L.Ed.2d 267 (1976) (dis-

cussing this circumstance as a "Hobson's choice").

■ [15] In this case, after hearing the guilty verdict, Breit filed for a new trial rather than a mistrial. We emphasize that when a trial is severely prejudiced by prosecutorial misconduct, the double-jeopardy analysis is identical, whether the defendant requests a mistrial, a new trial, or, on appeal, a reversal. *See United States v. Medina–Herrera,* 606 F.2d 770, 775 n. 5 (7th Cir.1979) (stating that, in the case of prosecutorial overreaching, there is no differentiation between a defense motion for new trial as opposed to a mistrial since ruling granting new trial was essentially a reserved ruling on the mistrial motion), *cert. denied,* 446 U.S. 964, 100 S.Ct. 2939, 64 L.Ed.2d 822 (1980); *Petrucelli v. Smith,* 544 F.Supp. 627, 632 (W.D.N.Y.1982) ("[R]eversal of a conviction for deliberately offensive prosecutorial misconduct warrants the same relief as a mistrial granted on that ground."), *reconsidered on other grounds,* 569 F.Supp. 1523 (W.D.N.Y. 1983), *vacated on other grounds,* 735 F.2d 684 (2d Cir.1984). Breit's right to be protected from double jeopardy is not compromised because he originally asked for a new trial, and now, on appeal, asks that we reverse his conviction. The defense of double jeopardy may not be relinquished. Section 30–1–10.

■ [16] In New Mexico, under the standard we adopted in *State v. Day,* 94 N.M. at 757, 617 P.2d at 146, the double-jeopardy bar to retrial is not triggered unless "the prosecutor engaged in any misconduct for the purpose of precipitating a motion for a mistrial, gaining a better chance for conviction upon retrial, or subjecting the defendant to the harassment and inconvenience of successive trials." The United States Supreme Court in *Oregon v. Kennedy* placed much narrower limits on the bar to reprosecution, holding

that the circumstances under which such a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a

mistrial was intended to provoke the defendant into moving for a mistrial.

456 U.S. at 679, 102 S.Ct. at 2091. Under *Kennedy,* double jeopardy attaches only if the prosecution engages in misconduct in a calculated and deliberate effort to "goad" the defendant into moving for a mistrial. *Id.* at 676, 679, 102 S.Ct. at 2089, 2091. This misconduct may be motivated by a desire to avoid acquittal by intentionally creating circumstances that require a new trial in the hopes of obtaining a more favorable climate for conviction the second time around. *Day,* 94 N.M. at 757, 617 P.2d at 146; *see also Downum v. United States,* 372 U.S. 734, 736, 83 S.Ct. 1033, 1034, 10 L.Ed.2d 100 (1963) (discussing forcing "a mistrial so as to afford the prosecution a more favorable opportunity to convict").

[17] Prior to *Kennedy,* federal courts pointed to a broader range of prosecutorial misconduct that would bar retrial of a defendant. These included situations in which the prosecution demonstrated gross negligence or intentional misconduct, was motivated by bad faith or malice, engaged in oppressive tactics, and acted to seriously prejudice and harass the defendant. *See Dinitz,* 424 U.S. at 611, 96 S.Ct. at 1081 (bad faith, harassment, prejudice); *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949) (oppressive practices); *United States v. Beasley,* 479 F.2d 1124, 1126 (5th Cir.) (gross negligence, intentional misconduct), *cert. denied,* 414 U.S. 924, 94 S.Ct. 252, 38 L.Ed.2d 158 (1973). Under the *Kennedy* rule, such examples of prosecutorial misconduct are not in and of themselves sufficient to bar retrial. *See Oregon v. Kennedy,* 456 U.S. at 675–76, 102 S.Ct. at 2089–90. If this prosecutorial misconduct—regardless of its character—is not intentionally designed to "provoke the defendant into moving for a mistrial," then reprosecution is not barred.

[18] Various policy reasons are offered to support the narrow rule articulated in *Kennedy.* One significant concern is that, as we noted in *Day,* an excessively broad double-jeopardy rule could have "a chilling effect on the prosecution." 94 N.M. at 757, 617 P.2d at 146. The U.S. Supreme Court in *Kennedy* elaborated upon this rationale:

The difficulty with the more general standards which would permit a broader exception than one merely based on intent is that they offer virtually no standards for their application. Every act on the part of a rational prosecutor during a trial is designed to "prejudice" the defendant by placing before the judge or jury evidence leading to a finding of his guilt. Given the complexity of the rules of evidence, it will be a rare trial of any complexity in which some proffered evidence by the prosecutor or by the defendant's attorney will not be found objectionable by the trial court.

*Oregon v. Kennedy,* 456 U.S. at 674–75, 102 S.Ct. at 2089. The *Kennedy* court called the prosecutorial-intent rule a "manageable standard" that "merely calls for the court to make a finding of fact." *Id.* at 675, 102 S.Ct. at 2089. It is common, in the criminal justice system, to infer intent from objective facts and circumstances. *Id. Kennedy* was also concerned that both state and federal courts have the same "easily applied" standard when reviewing this issue. *Id.* We believe, however, that the *Kennedy* court improvidently failed to weigh the effects of the misconduct of prosecutors who do not subjectively intend to provoke a mistrial.

## B. CRITIQUE OF THE PROSECUTORIAL-INTENT RULE

[19] Among some state courts there is distinct discomfort with the *Kennedy* rule. They find support in the fact that four members of the U.S. Supreme Court disagreed with the *Kennedy* plurality. *See, e.g., Pool v. Superior Court,* 139 Ariz. 98, 107, 677 P.2d 261, 270 (1984) (en banc). The succinctness and manageability of a standard of law does not necessarily bespeak its justness or applicability to the problem it is intended to address. Several courts have argued that the *Kennedy* rule does not adequately protect double-jeopardy interests.

[20] The failings of the *Kennedy* rule are brought in sharp relief by the Pennsylvania case *Commonwealth v. Smith,* 532 Pa. 177, 615 A.2d 321 (1992). *Smith* demonstrated that, while there may be no intent to provoke a mistrial, the misconduct of the prosecutor may be so perfidious that double jeopardy

must attach. In *Smith* the defendant was sentenced to death for first-degree murder. Thereafter it was revealed that the prosecutors had withheld potentially exculpatory physical evidence during the first trial, and had knowingly denied that its chief witness had been given a favorable sentencing agreement in exchange for testifying. *Id.* 615 A.2d at 322–24. Moreover, on appeal, the prosecution intentionally suppressed the exculpatory evidence while arguing in favor of the death sentence, and attempted to discredit a state trooper who had testified to the existence of that evidence. *Id.* In short, the state had deliberately concealed "its efforts to subvert the truth-determining process." *Id.* at 322 (quoting *Commonwealth v. Simons,* 514 Pa. 10, 522 A.2d 537, 544 (1987) (Flaherty, J., concurring)). Contrary to the requirement of the *Kennedy* rule, there was no intent to goad the defendant into moving for a mistrial. In fact, the intention was the opposite: to prevent the defendant from moving for a mistrial by concealing how he had been wrongfully convicted. *Id.* Under the language of the rule in *Kennedy,* double jeopardy would not bar a new trial in *Smith.* The Pennsylvania court, interpreting the state constitution, concluded otherwise.

> We now hold that the double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial.

*Id.* at 325. *Smith* shows that the deliberate effort to prejudice a defendant's right to a fair trial does not appear to fall within the language of the *Kennedy* rule.

[21] As we stated above, a defendant has no real choice if the prosecution is intent upon goading the defendant into declaring a mistrial. The weakness of the *Kennedy* rule is highlighted by the fact that other forms of misconduct and harassment and bad faith can also leave a defendant with little choice. Donald E. Burton, Note, *A Closer Look at the Supreme Court and the Double Jeopardy Clause,* 49 Ohio St.L.J. 799, 817 (1988). As

Justice Marshall stated, it is questionable whether "the Government in such cases tailors its misconduct to achieve one improper result as opposed to another." *Green v. United States,* 451 U.S. 929, 931 n. 2, 101 S.Ct. 2005, 2007 n. 2, 68 L.Ed.2d 316 (1981) (Marshall, J., dissenting from denial of certiorari). Justice Stevens identified circumstances that would not fall under the *Kennedy* rule:

> For example, a prosecutor may be interested in putting the defendant through the embarrassment, expense, and ordeal of criminal proceedings even if he cannot obtain a conviction. In such a case, with the purpose of harassing the defendant the prosecutor may commit repeated prejudicial errors and be indifferent between a mistrial or mistrials and an unsustainable conviction or convictions. Another example is when the prosecutor seeks to inject enough unfair prejudice into the trial to ensure a conviction but not so much as to cause a reversal of that conviction. This kind of overreaching would not be covered by the Court's standard because, by hypothesis, the prosecutor's intent is to obtain a conviction, not to provoke a mistrial. Yet the defendant's choice—to continue the tainted proceeding or to abort it and begin anew—can be just as "hollow" in this situation as when the prosecutor intends to provoke a mistrial.

*Oregon v. Kennedy,* 456 U.S. at 689, 102 S.Ct. at 2096 (Stevens, J., concurring) (footnotes omitted). There are numerous examples of cases, like the one at bar, in which, despite repeated warnings from the court, a new trial is deemed necessary because of incessant prosecutorial misconduct, even though there was no intention to cause a mistrial. *See* John R. Tunheim, *Criminal Justice: Expanded Protections Under the Minnesota Constitution,* 20 Wm. Mitchell L.Rev. 465, 479–80 (1994).

[22] The Oregon Supreme Court, in its criticism of the *Kennedy* rule, argued that the prosecutorial-intent standard would apply only to a small number of extreme cases:

> [A] finding that a prosecutor initially pursued a course of prejudicial misconduct for

the purpose of forcing a mistrial is a grave matter. Such behavior is a contempt of court. It also is a violation of professional standards that can lead to disbarment or other discipline, and perhaps of federal civil rights statutes. A judge prepared to make such a finding properly would not only declare a mistrial without possibility of reprosecution but also report the episode to the Oregon State Bar, Code of Judicial Conduct Canon 3(B)(3). But we do not think that impermissible double jeopardy for the defendant is limited to the few situations in which a judge is sufficiently convinced of a prosecutor's improper intentions to invoke those penalties. That places too heavy a burden on the inference that a defendant must ask a judge to draw from the objective conduct and circumstances.

*State v. Kennedy,* 666 P.2d at 1325–26 (citations and footnotes omitted). The object of constitutional double-jeopardy provisions is not to punish disreputable prosecutors. The purpose, rather, is to protect the defendant's interest in having the prosecution completed by the original tribunal before whom the trial was commenced. *Pool,* 139 Ariz. at 108, 677 P.2d at 271. Defendants should be protected from reprosecution once a prosecutor's actions, regardless of motive or intent, rise to such an extreme that a new trial is the only recourse. *See State v. Kennedy,* 666 P.2d at 1326.

[23] One of the most persuasive criticisms of the *Kennedy* rule is that the subjective intentions of the prosecutor are inherently unknowable. *Oregon v. Kennedy,* 456 U.S. at 679–80, 102 S.Ct. at 2091–92 (Powell, J., concurring). In his criticism of the rule adopted by the plurality of the *Kennedy* Court, Justice Stevens described the inherent impracticality of such a requirement:

It is almost inconceivable that a defendant could prove that the prosecutor's deliberate misconduct was motivated by an intent to provoke a mistrial instead of an intent simply to prejudice the defendant. The defendant must shoulder a strong burden to establish a bar to reprosecution when he has consented to the mistrial, but the

Court's subjective intent standard would eviscerate the exception.

*Id.* at 688, 102 S.Ct. at 2096 (Stevens, J., concurring) (footnotes omitted). Moreover, as noted by the dissent in a Texas double-jeopardy case, it is unclear what standards of proof would be appropriate when measuring the intentional violation of so fundamental a right as a fair trial:

Inferring intent is a familiar process. It is familiar in deciding civil cases on a "more probable than not" basis, and in criminal cases where the facts and circumstances prove defendants' intent "beyond a reasonable doubt." However, neither of these standards is appropriate for determining a prosecutor's intent. Determining his "probable" intent is inherently a guess, not appropriate for criminal proceedings or fundamental rights, and defendants certainly should not have to prove beyond a reasonable doubt that their rights were violated.

*Bauder v. State,* 880 S.W.2d 502, 504 n. 1 (Tex.App.1994) (Butts, J., dissenting) [hereinafter *Bauder I* ], *rev'd,* 921 S.W.2d 696, 696–700 (Tex.Crim.App.1996) (en banc) (refusing to apply *Kennedy* test to state constitution, and expressing approval for lower court dissent by Butts, J.) [hereinafter *Bauder II* ]. It has been urged that, to be meaningful, the protection against double jeopardy must be analyzed with an objective standard. *Bauder I,* 880 S.W.2d at 504–05 (Butts, J., dissenting).

[24] In response to such concerns, some state courts have adopted a more encompassing standard for the double-jeopardy clauses of their state constitutions than *Kennedy* would allow for the Fifth Amendment to the U.S. Constitution. Breit urges that we adopt a modified standard for Article II, Section 15 of the New Mexico Constitution.

## C. STATE VERSUS FEDERAL DOUBLE–JEOPARDY PROTECTIONS

[25] We have stated that our State Constitution's double-jeopardy provision "is subject to the same construction and interpretation as its counterpart in the Fifth Amendment to the United States Constitution." *Day,* 94 N.M. at 756, 617 P.2d at 145.

That does not mean, however, that we must embrace United States Supreme Court precedent when it changes a standard formerly adopted by this Court. *See, e.g., State v. Gutierrez,* 116 N.M. 431, 445–47, 863 P.2d 1052, 1066–68 (1993) (declining to adopt the "good faith exception" to the exclusionary rule articulated by *United States v. Leon,* 468 U.S. 897, 922–25, 104 S.Ct. 3405, 3420–22, 82 L.Ed.2d 677 (1984), and continuing to follow the rule first expressed in *Weeks v. United States,* 232 U.S. 383, 393–94, 34 S.Ct. 341, 344–45, 58 L.Ed. 652 (1914)). In *Gutierrez* we stated that we will "undertake independent analysis of our state constitutional guarantees when federal law begins to encroach on the sanctity of those guarantees." 116 N.M. at 440, 863 P.2d at 1061 (1993). This is one of those situations.

[26] As noted above, in *Day* we concluded that double jeopardy barred retrial when "the prosecutor engaged in any misconduct for the purpose of precipitating a motion for a mistrial, gaining a better chance for conviction upon retrial, or subjecting the defendant to the harassment and inconvenience of successive trials." *Day,* 94 N.M. at 757, 617 P.2d at 146. This standard was an amalgam of various pronouncements by the United States Supreme Court. *Day* mentioned with approval *United States v. Tateo,* 377 U.S. 463, 468 n. 3, 84 S.Ct. 1587, 1590 n. 3, 12 L.Ed.2d 448 (1964), in which the U.S. Court suggested that reprosecution may be barred when prosecutorial misconduct is motivated by a "fear that the jury was likely to acquit the accused". As *Day* noted, a similar concern was expressed by *United States v. Jorn,* 400 U.S. 470, 485 n. 12, 91 S.Ct. 547, 557 n. 12, 27 L.Ed.2d 543 (1971) ("[W]here a defendant's mistrial motion is necessitated by judicial or prosecutorial impropriety designed to avoid an acquittal, reprosecution might well be barred."). All of the elements of the rule adopted by *Day* were included in a double-jeopardy standard set forth earlier by *United States v. Dinitz:*

> The Double Jeopardy Clause does protect a defendant against governmental actions intended to provoke mistrial requests and thereby to subject defendants to the substantial burdens imposed by multiple prosecutions. It bars retrials where "bad-faith conduct by judge or prosecutor," [*Jorn,* 400 U.S. at 485, 91 S.Ct. at 557], threatens the "(h)arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict" the defendant. [*Downum,* 372 U.S. at 736, 83 S.Ct. at 1034].

424 U.S. at 611, 96 S.Ct. at 1081; *see also Lee v. United States,* 432 U.S. 23, 33, 34, 97 S.Ct. 2141, 2147, 2148, 53 L.Ed.2d 80 (1977) (applying the *Dinitz* standard). Thus, the federal cases upon which we based our double-jeopardy rule in *Day* were narrowly restricted by *Kennedy* to a rule based upon prosecutorial intent. *See Oregon v. Kennedy,* 456 U.S. at 679, 102 S.Ct. at 2091. We need not adopt this narrow approach when interpreting our State Constitution.

 [27] Moreover, as a general principle, we need not, in interpreting the provisions of our State Constitution, adopt the standard that is applicable to the comparable federal provision. *See, e.g., Campos v. State,* 117 N.M. 155, 158, 870 P.2d 117, 120 (1994) (according defendants more protection than would federal courts in the warrantless public arrests of felons); *State v. Cordova,* 109 N.M. 211, 217, 784 P.2d 30, 36 (1989) (concluding state search warrant rules better effectuate the principles behind N.M. Const. art. II, § 10 than does the federal "totality of the circumstances" test). We are bound by the decisions of the United States Supreme Court with regard to the interpretation of the federal constitution. Moreover, the decisions of that Court greatly influence our own interpretation of those provisions in our State Constitution that correspond to federal provisions. *Pool,* 139 Ariz. at 108, 677 P.2d at 271. But, as explained above, when this Court derives an interpretation of New Mexico law from a federal opinion, our decision remains the law of New Mexico even if federal doctrine should later change. *See State v. Kennedy,* 666 P.2d at 1321. When citing to federal case law, we do so because we find persuasive the views expressed therein, and because we recognize the value of uniformity in the advancement and application of the rights guaranteed by both our state and federal constitutions. But we are not bound to

interpret our State's Constitution or laws in accordance with federal doctrine. *Gutierrez*, 116 N.M. at 436, 863 P.2d at 1057.

[28] Like the Pennsylvania Supreme Court in *Smith*, a growing number of state courts have rejected or expanded upon the *Kennedy* rule when double-jeopardy claims are urged under their own state constitutions. Most notable is the view taken by the Oregon Supreme Court in *State v. Kennedy*. The U.S. Supreme Court's *Kennedy* opinion was remanded back to the state of Oregon. On remand, the Oregon Supreme Court criticized the U.S. Supreme Court decision on a number of grounds, including several of the arguments presented above. *State v. Kennedy*, 666 P.2d at 1324. The Oregon court recognized, however, that its differences with the federal court were narrow. *Id.* The court stated, "We believe that the acknowledged objective of the double jeopardy guarantee can be served by a rule that avoids the indefiniteness of 'overreaching' and yet extends beyond intentional provocation to cover other possible abuses." *Id.* at 1325. The court concluded that since Kennedy's offense implicated only state law, the Oregon Constitution demanded a different standard than the U.S. Constitution:

> We therefore conclude that a retrial is barred by article I, section 12, of the Oregon Constitution when improper official conduct is so prejudicial to the defendant that it cannot be cured by means short of a mistrial, and if the official knows that the conduct is improper and prejudicial and either intends or is indifferent to the resulting mistrial or reversal.

*Id.* at 1326. Despite its criticism of the *Kennedy* rule, the Oregon court concluded that, in Kennedy's case, there was no " 'knowing' misconduct coupled with indifference toward the probable risk of a mistrial" that would impose a constitutional bar against second trial. *Id.* at 1327.

[29] Double-jeopardy issues, similar to those in the case at bar, were raised in the Arizona case of *Pool v. Superior Court*. The prosecutor's misconduct in *Pool*, like that of the prosecutor in Breit's first trial, was not a single instance. In characterizing the prosecutor's actions, the Arizona Supreme Court stated that, "[t]he problem here is not some isolated result of loss of temper, but the cumulative effect of a line of questioning in which the prosecutor posed numerous improper questions resulting in at least two bench conferences and one court admonishment." *Pool*, 139 Ariz. at 106, 677 P.2d at 269. The trial court granted a mistrial based upon prosecutorial misconduct but concluded that the prosecutor did not intend to provoke the mistrial. The *Pool* court disagreed, stating that the evidence suggested a prosecutorial intent to cause a mistrial. But it also noted that the prosecutor might have been motivated by other interests, like those mentioned above. *Id.* at 107, 677 P.2d at 270. The Arizona court was concerned that none of these motives would be addressed by the *Kennedy* rule. *Id.* at 107–08, 677 P.2d at 270–71. Concluding that state courts are not obliged to adopt federal standards when interpreting state constitutional provisions, the *Pool* court discarded the *Kennedy* rule when the state's double-jeopardy clause was at issue. *Id.* at 108–09, 677 P.2d at 271–72. The court formulated a three-part test, holding

> that jeopardy attaches under art. 2, § 10 of the Arizona Constitution when a mistrial is granted on motion of defendant or declared by the court under the following conditions:
>
> 1. Mistrial is granted because of improper conduct or actions by the prosecutor; and
>
> 2. such conduct is not merely the result of legal error, negligence, mistake, or insignificant impropriety, but, taken as a whole, amounts to intentional conduct which the prosecutor knows to be improper and prejudicial, and which he pursues for any improper purpose with indifference to a significant resulting danger of mistrial or reversal; and
>
> 3. the conduct causes prejudice to the defendant which cannot be cured by means short of a mistrial.

*Id.* (footnote omitted). Applying this test, the *Pool* court concluded that reprosecution was barred. *Id.* at 109, 677 P.2d at 272.

[30] The Texas Court of Criminal Appeals in *Bauder v. State* broadened the *Ken*-

*nedy* rule with a standard of conscious disregard. Under the Texas Constitution

> a successive prosecution is jeopardy barred after declaration of a mistrial at the defendant's request, not only when the objectionable conduct of the prosecutor was intended to induce a motion for mistrial, but also when the prosecutor was aware but consciously disregarded the risk that an objectionable event for which he was responsible would require a mistrial at the defendant's request.

*Bauder II,* 921 S.W.2d at 699 (reversing *Bauder I,* 880 S.W.2d 502). This standard is similar to the one we adopt below.

[31] The North Carolina Court of Appeals, in *State v. White,* was similarly critical of the *Kennedy* rule. *State v. White,* 85 N.C.App. 81, 354 S.E.2d 324, 329 (1987), *aff'd,* 322 N.C. 506, 369 S.E.2d 813 (1988). The court stated, "In our view, the better reasoned arguments support the broader test that includes bad faith prosecutorial overreaching or harassment aimed at prejudicing the defendant's chances for acquittal, whether in the current trial or a retrial." *Id.* The Michigan Court of Appeals also found "substantial difficulties with the United States Supreme Court's *Kennedy* standard." *People v. Dawson,* 154 Mich.App. 260, 397 N.W.2d 277, 282 (1986), *aff'd,* 431 Mich. 234, 427 N.W.2d 886 (1988). That court adopted the three-part test from *Pool* quoted above. *Id.* 397 N.W.2d at 283–84 (quoting *Pool,* 139 Ariz. at 108–09, 677 P.2d at 271–72).

### D. THE NEW MEXICO DOUBLE-JEOPARDY CLAUSE; A STANDARD OF "WILLFUL DISREGARD"

[32] Like these other state courts, we do not agree with the fundamental premise of the *Kennedy* court, that a rule broader than the intentional provocation of a mistrial, would "offer virtually no standards." *Oregon v. Kennedy,* 456 U.S. at 674–75, 102 S.Ct. at 2089. We therefore adopt the following test (implicit in *Day* ) when a defendant moves for a mistrial, retrial, or reversal because of prosecutorial misconduct: Retrial is barred under Article II, Section 15, of the New Mexico Constitution, when improper official conduct is so unfairly prejudicial to the defendant that it cannot be cured by means short of a mistrial or a motion for a new trial, and if the official knows that the conduct is improper and prejudicial, and if the official either intends to provoke a mistrial or acts in willful disregard of the resulting mistrial, retrial, or reversal.

[33] The idea that the misconduct must be so prejudicial as to cause a mistrial or new trial suggests that double jeopardy will rarely bar reprosecution if the misconduct is an isolated instance during the course of an otherwise fair trial. Though we indicate the official must know, or under certain circumstances is presumed to know, that the conduct is improper, we doubt a claim of lack of experience could lift the bar of double jeopardy. Rare are the instances of misconduct that are not violations of rules that every legal professional, no matter how inexperienced, is charged with knowing. *See Pool,* 139 Ariz. at 107, 677 P.2d at 270 ("The law cannot reward ignorance; there must be a point at which lawyers are conclusively presumed to know what is proper and what is not.").

[34] We have chosen a standard of "willful disregard" rather than the Oregon court's use of the word "indifferent." The former term is a predominately legal expression with a well-developed jurisprudential meaning. "Indifferent" has been used by courts interchangeably with "heedless," "careless," "reckless," "inattentive," "neglectful," "negligent," and other terms that connote a virtual lack of awareness. *See Konig v. Nevada–California–Oregon Ry.,* 36 Nev. 181, 135 P. 141, 162 (1913) (heedless, careless, reckless); *Stout v. Gallemore,* 138 Kan. 385, 26 P.2d 573, 577 (1933) (inattentive, neglectful, negligent). "Willful disregard" is a more precise term, emphasizing that the prosecutor is actually aware, or is presumed to be aware, of the potential consequences of his or her actions. The term connotes a conscious and purposeful decision by the prosecutor to dismiss any concern that his or her conduct may lead to a mistrial or reversal. *Cf. State v. Parenteau,* 153 Vt. 123, 569 A.2d 477, 479–80 (1989) (consciously and purposefully).

[35] Like the test adopted by the Oregon court, our rule is a narrow expansion of the federal standard established by *Kennedy*. *See State v. Kennedy*, 666 P.2d at 1325. It makes little difference, when the constitutional rights of the defendant are at stake, "[w]hether the prosecutor deliberately pursues an improper course of conduct because he means to goad a defendant into demanding a mistrial or because he is willing to accept a mistrial and start over." *Id.* at 1324. "From the standpoint of a defendant forced to choose between accepting prejudicial errors or undergoing a second trial, the precise degree of the official's mens rea is a matter of indifference." *Id.* Raising the bar of double jeopardy should be an exceedingly uncommon remedy. *See Bauder II*, 921 S.W.2d at 699–700. It will remain uncommon under the narrow standard we adopt today.

[36] We wish to emphasize that we are not overruling *Day*. The standard of "willful disregard" merely encompasses and augments the circumstances implicated by the rule in *Day*. *See Day*, 94 N.M. at 757, 617 P.2d at 146. With this standard, we recognize that under the New Mexico Constitution, the bar to double jeopardy may be triggered by prosecutorial misconduct other than the intentional provocation of a mistrial.

### E. THE NEW MEXICO DOUBLE–JEOPARDY CLAUSE BARS THE FURTHER PROSECUTION OF BREIT

[37] We now apply the test outlined above to the facts of the case at hand. Before his second trial, Breit argued that he could not be retried on double-jeopardy grounds. In a careful and persuasive memorandum opinion, District Judge Sandra A. Grisham agreed with Breit and barred retrial. We have included, in the Appendix to this opinion, almost the entire text of Judge Grisham's memorandum opinion because it gives a first-person account of the pervasive, incessant, and outrageous nature of the prosecutor's misconduct during Breit's first trial. Our conclusion that reprosecution is barred in this case is based upon the findings of the trial court, corroborated by evidence included in the record.

[38] We first discuss whether the prosecutor in Breit's first trial did indeed intend to cause a mistrial. In its memorandum opinion, the trial court expressly addressed the question of the prosecutor's intent:

The court does not believe that the prosecutor wanted a mistrial in this case. This is evidenced not only by the very arrogance with which the trial and the closing were conducted, but also by the state's acquiescence to a proposed plea agreement after a new trial was ordered....

*Breit I*, slip op. at 6 (Appendix para. 84). The State appealed and the Court of Appeals reversed, finding no double-jeopardy bar under the *Kennedy* rule. *Breit III*, slip op. at 3–4. The Court of Appeals reasoned that "[t]he trial court's implied determination that there was no intent to cause a mistrial is dispositive of this case—absent such intent, the double jeopardy clauses of the state and federal constitution do not bar retrial of defendant." *Id.* at 4.

[39] We defer to the conclusion of the trial judge, who oversaw the entire proceeding, and who was severely critical of the prosecution. There is no reason the trial judge would be charitable in her assessment of the prosecution, yet she expressly found the prosecutor did not want a mistrial. Were we to apply the *Kennedy* rule, we would be forced to conclude that, despite the prosecutor's extreme misconduct—as depicted in the memorandum opinion—double jeopardy would not bar Breit's second trial. The reprehensible conduct of the prosecutor in this case forces us to conclude that double-jeopardy interests are not adequately protected when prosecutorial intent to cause a mistrial is the only consideration.

[40] However, because we are deciding this question on state constitutional grounds, we must inquire whether the prosecutor acted in willful disregard of the resulting mistrial, retrial, or reversal. Thus, we will carefully examine the prosecutor's conduct in light of the totality of the circumstances of the trial. *Kessler*, 530 F.2d at 1256. If the prosecutor's conduct demonstrates willful

disregard of the defendant's right to a fair trial, then a second trial is barred.

[41] The record, fairly summarized in the trial court's memorandum opinion in the Appendix, strongly supports the trial court's conclusion that this "was a trial out of control." *Breit I,* slip op. at 10 (Appendix para. 86). The prosecutor's misconduct began "[b]arely into his opening statement." *Id.* at 3 (Appendix para. 57). In his opening, he attempted to inflame the jury with allegations that were irrelevant, matters that could not permissibly be presented as evidence, and exaggerated claims that no evidence could ever support. *Id.* at 3–4 (Appendix para. 57–60). When objections were raised and sustained he expressed sarcasm and scorn toward opposing counsel and the court. *Id.* at 4 (Appendix para. 61).

[42] During the questioning of witnesses he engaged in improper arguments with witnesses. *Id.* at 4, 5 (Appendix para. 63, 65). On cross-examination, even after direct admonition from the court, he attempted to solicit irrelevant comments from the defendant on the testimony of other witnesses. *Id.* at 4–5 (Appendix para. 63, 65). He directed belligerent remarks at opposing counsel. Apparently referring to defense counsel's hand movements as he held an item of evidence, the prosecutor, during a bench conference, uttered an implied threat without provocation: "You wave that at me one more time, sweetheart—" *Id.* at 8 (Appendix para. 80). Throughout the trial, in front of the jury, both his tone of voice and nonverbal conduct were highly prejudicial. He displayed "sarcasm, sneering, rolling of eyes and exaggerated expressions." *Id.* at 5 (Appendix para. 66). So pervasive was the prosecutorial misconduct that, had the defense counsel objected at every opportunity, he would have been placed "in the untenable position of appearing to hamper the proceedings and hide evidence from the jury." *Id.* at 6 (Appendix para. 68).

[43] The misconduct continued through the closing, even through the rebuttal arguments. During closing the prosecutor made direct appeals to the sympathies and prejudices of the jury, making comments utterly irrelevant to the facts as they applied to the elements of the alleged crime. *Id.* (Appendix para. 69). He belittled the defendant's fundamental right to remain silent, and portrayed his right to counsel as a ploy to avoid punishment. *Id.* at 7 (Appendix para. 71, 72). In numerous comments he suggested that opposing counsel had engaged in perjury, lying, and collaborating with the defendant to fabricate a defense. *Id.* (Appendix para. 75). At one notable moment during closing he declared, "It is not up to the State to show self-defense. That is a legal theory concocted by the defendant and his lawyers to sell to you." *Id.* (text conformed to stylistic standards adopted by this Court) (Appendix para. 75). He made numerous statements expressing or implying his personal belief in the guilt of the defendant, the veracity of the witnesses, and the competency and honesty of opposing counsel. *Id.* at 9 (Appendix para. 72–75, 77, 79, 81).

[44] The prosecutor's inappropriate conduct continued even after a new trial was granted. He submitted a motion asking the court to reconsider and withdraw its holding that double jeopardy barred any further prosecution of Breit. Accompanying this motion were affidavits from eleven jurors in which they alleged the prosecutor's actions did not prejudice their decision. Judge Grisham, in a memorandum opinion on this motion, was appropriately outraged.

> The most disturbing element of the State's motion is the use of affidavits by jurors in this case. At least by the beginning of this century, if not earlier, there was a near-universal and fairly established common-law rule in the United States which flatly prohibited the admission of jury testimony concerning their verdict. [*See* 8 John H. Wigmore, *Evidence in Trials at Common Law* § 2352, at 696–97 (John T. McNaughton ed., 1961).] The affidavits filed in this action do not address the issue of whether Mr. Van Arnam's conduct was designed to avoid an acquittal.

*Breit II,* slip op. at 2 (text conformed to stylistic standards adopted by this Court). She noted that such use of affidavits is forbidden by our rules of evidence. *See* SCRA 1986, 11–606(B) (1996) (precluding an affidavit by a juror concerning whether the verdict

was influenced by anything affecting any juror's mental processes or emotions). By use of such affidavits the prosecutor was trying "to show an absence of manipulation from the very persons who were manipulated." *Breit II,* slip op. at 2 n. 1.

[45] As isolated instances, most of these infractions would be unlikely to raise the bar to retrial. But in this case, as the memorandum opinion in the Appendix demonstrates, the misconduct was unrelenting and pervasive. Moreover, the prosecutor's actions extended beyond the incidents that are recorded in the transcript. As the trial court indicated, the transcript alone cannot "convey the overall atmosphere" of a trial infected by wordless misconduct that would never appear in a court record. *Breit I,* slip op. at 2. The cumulative effect was to deny the defendant a fair trial. A motion for a mistrial was the only cure. *See Pool,* 139 Ariz. at 106, 677 P.2d at 269 (misconduct was cumulative, not an isolated temperamental moment).

[46] It is difficult, from the record, to discern the prosecutor's motives for behaving so outrageously. The trial court notes that the prosecution may have been concerned that there would be difficulties in securing a conviction in this case. The record suggests that inept police work made it impossible to decisively prove or disprove that Breit acted in self-defense, that the evidence of premeditation for a first-degree murder charge was not conclusive, and that the three eyewitnesses had appeared only reluctantly. Moreover, the claim of self-defense rested entirely on Breit's own testimony. "By destroying the credibility of the defendant and his counsel through unfair, unethical and constitutionally impermissible trial tactics, the prosecutor was attempting to avoid an acquittal at any cost." *Breit I,* slip op. at 10 (Appendix para. 85).

[47] We note that the trial judge, in her memorandum opinion, was critical of her own error in permitting the trial to continue long after the prosecutor's uncontrollable intransigence became apparent. She is correct in concluding that standards of justice should outweigh concerns that "[a] mistrial early on would have wreaked havoc on the court's calendar and budget and in the lives of counsel and litigants." *Breit I,* slip op. at 10 (Appendix para. 86).

[48] In avoiding an acquittal at any cost, it appears that among the costs the prosecution was willing to incur were a mistrial, a new trial, or a reversal on appeal. There is no suggestion in the record that the prosecutor acted out of error, or negligence, or mistake. Under minimal legal, ethical, and professional standards, we can only conclude that he acted knowingly and intentionally. *See Pool,* 139 Ariz. at 107, 677 P.2d at 270. That the misconduct was willful is underscored by trial judge's conclusion that the prosecution lacked "an underlying respect for our system of justice." *Breit I,* slip op. at 10 (Appendix para. 86). The unavoidable conclusion from such egregious misconduct, is that the prosecutor was fully aware that his actions would deprive Breit of his right to a fair trial. The prosecutor unquestionably acted with "willful disregard of the resulting mistrial, retrial, or reversal." With another trial, the public interest in fair trials that end in just judgments would be subverted. *Kessler,* 530 F.2d at 1258. As Justice Douglas eloquently explained, the double-jeopardy clause

> is designed to help equalize the position of government and the individual, to discourage abusive use of the awesome power of society. Once a trial starts jeopardy attaches. The prosecution must stand or fall on its performance at the trial. I do not see how a mistrial directed because the prosecutor has no witnesses is different from a mistrial directed because the prosecutor abuses his office and is guilty of misconduct. In neither is there a breakdown in judicial machinery such as happens when the judge is stricken, or a juror has been discovered to be disqualified to sit, or when it is impossible or impractical to hold a trial at the time and place set. The question is not, as the Court of Appeals thought, whether a defendant is "to receive absolution for his crime." The policy of the Bill of Rights is to make rare indeed the occasions when the citizen can for the same offense be required to run the gantlet twice. The risk of judicial arbi-

trariness rests where, in my view, the Constitution puts it—on the Government. *Gori v. United States,* 367 U.S. 364, 372–73, 81 S.Ct. 1523, 1528, 6 L.Ed.2d 901 (1961) (Douglas, J., dissenting) (citations omitted) (quoting *United States v. Gori,* 282 F.2d 43, 48 (2d Cir.1960)). The retrial of Breit is barred by the Article II, Section 15 of the New Mexico Constitution.

## III. CONCLUSION

[49] On double-jeopardy grounds we reverse Breit's convictions and discharge him from any further prosecution in this matter.

[50] IT IS SO ORDERED.

[51] RANSOM and McKINNON, JJ., concur.

### APPENDIX

[52] *State v. Breit,* No. CR–88–175, slip op. (N.M.Dist.Ct. Aug. 2, 1990) (Grisham, J.).

[53] We have conformed the text, including punctuation, capitalization, and citation form, to the stylistic standards adopted by this Court. Such alterations have usually not been noted. Where possible, the dialogue quoted from the trial has been transcribed directly from the original trial transcript. Quoted case law has also been transcribed from its original source. In the few instances when we altered the memorandum's wording for the sake of clarity or to conform with the language of the transcript, such changes are noted with [square brackets].

### Memorandum Opinion

. . . .

[54] The role of a prosecutor is vastly different from that of defense counsel—a fact which should be well known to even the most casual practitioner of criminal law, let alone one practicing primarily in the criminal field since 1983, as had been the assistant district attorney in this case. The prosecutorial role was eloquently described in *Berger v. United States,* 295 U.S. 78, [88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935)]:

The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

[55] The conduct of the prosecutor in this case showed an extreme disregard for the above standard. Although it is impossible to convey the overall atmosphere of the trial with cold written examples, the following excerpts are somewhat illustrative of the problems in this case.

[56] The proper purpose of the opening statement is to tell the jury what the attorney intends to prove. That is all. It is not an opportunity for the attorney to impress the jury with his wit and charm, argue the case, inflame and prejudice the jury, or to give the attorney's opinion of the defendant or defense counsel.

[57] Barely into his opening statement, the prosecutor referred to the defendant as having "some sort of paranoid visions of communists and the government being after him." Upon objection, the prosecutor, interrupting the court's ruling, promised to stay away from psychiatric testimony. His very next words to the jury included, "The evidence is going to show in this case state-

ments by the defendant; the government being after him, communist take-over, these sorts of things." Thus, the prosecutor violated two cardinal rules in a very short period of time: he attempted to inflame the jury with reference to matters not even arguably relevant to the trial; after objection and [an] implication that he would desist, he continued to refer to evidence which would not be elicited during trial.

[58] That a prosecutor, during opening, must confine himself or herself to matters which can be proven is not an arcane rule buried in the depths of some academic tome. It is basic to the theme underlying our entire system of criminal justice: the accused must be convicted on the facts.

[59] The prosecutor continued to attempt to inflame the jury with matters which could not be brought before them as evidence, such as: "Wouldn't it be nice if we could call Oscar (the victim) to the stand and say, 'What did you hear, Oscar?'" The court can see no good faith argument available that the above statement was intended merely to tell the jury what the evidence would show.

[60] The prosecutor told the jury that when the defendant was drinking, "he was a demon." There was no testimony to support so strong a characterization. The prosecutor in his attempts to improperly inflame the jury did not confine himself to the defendant's character:

What we have is a dead man that the evidence will show was gunned down while sitting in his easy chair in his living room, a man who'd never raised his hand against anyone, a man who in fact had never raised his voice against anyone, and a man who loved children and took these people in out of love and kindness[.]

Certainly, the prosecutor may show the peaceful character of a victim when self-defense is alleged, but just as certainly there is no possible way this prosecutor could have proven that the victim never raised his hand or his voice against anyone. Puffery may be acceptable on a car sales lot: it is not in the opening statement of a murder trial, and the court should have sustained the objection.

[See Kenneth J. Rampino, Annotation, *Propriety and Prejudicial Effect of Prosecutor's Remarks as to Victim's Age, Family Circumstances, or the Like*, 50 A.L.R.3d 8, 20 (1973).]

[61] Objections, however, elicited sarcasm from the prosecutor, and implied his opinion (to which he is entitled to hold, but not to express to the jury), of opposing counsel and the court:

**Mr. Van Arnam:** [W]e're going to bring in.... the chair that he was murdered in, and I'll tell you right now it's—

**Mr. Boaz:** We're going to object to counsel referring to "murder." Whether it's a murder or not is going to be an issue that the jury in this case is going to determine.

**The Court:** The objection will be sustained.

**Mr. Van Arnam:**—the chair that the defendant with willful and deliberate premeditation shot Oscar Hill in. And as a result, Oscar Hill died. You'll have to decide if that's murder.

[62] The opening argument of the prosecutor, although far removed from a simple statement of the evidence which he intended to present, was a more than adequate preview of the conduct to come.

[63] The trial was replete with improper argument with witnesses, remarks addressed to opposing counsel, attempts, even after direct admonishment from the court, to solicit irrelevant comments on the testimony of other witnesses.

[64] An example of the latter:

**Mr. Van Arnam:** Now, the two young boys that you heard testify, T.R. and H.W.—

**Defendant:** Yes, sir.

**Mr. Van Arnam:**—I take it you're calling them liars.

**The Court:** The Court will instruct the attorneys not to ask one witness to comment upon another witness's testimony.

**Mr. Van Arnam:** Okay. Did you hear them testify?

**Defendant:** Yes, sir, I did.

**Mr. Van Arnam:** Did you hear them testify that only one shot was fired?

**Defendant:** Yes, sir, I did.

[65] Arguing with a defense witness:

**Mr. Van Arnam:** [W]as the cup and wadding taken out of the hole that was blown through Oscar Hill in State's Exhibit 10, okay? Can we make that assumption? Follow with me as an expert.

**Mr. Welch:** Okay, that's what I'm having trouble with. You're using the idea of a hole blown. There is no hole blown in Mr. Hill.

**Mr. Van Arnam:** Call it what you want.

**Mr. Welch:** Okay, it's a wound.

**Mr. Van Arnam:** Okay, you're the expert.

[66] Fortunately, much of the misconduct was outside the presence and/or the hearing of the jury and frequently off the record: the shouting at opposing counsel, exchanging of obscene gestures, rude remarks, etc. Much of it, however, was apparent to the jury but not necessarily [in] the record: the prosecutor's tone, sarcasm, sneering, rolling of eyes and exaggerated expressions.

[67] Any of the above incidents of misconduct, *if isolated,* would not necessarily concern the court, but the pattern, continuing throughout the trial, was clearly calculated to impose the prosecutor's personal view of the evidence into the case and to prejudice and influence the jury.

[68] Defense counsel, it is true, did not object each and every time he could have. But to hold that each objection not made was waived, under these circumstances, would be to put the defendant in the untenable position of appearing to hamper the proceedings and hide evidence from the jury. The assistant district attorney's conduct was simply too pervasive.

[69] The defendant would have been entitled to a new trial on the basis of the opening and evidentiary portions of the trial, but the most egregious conduct occurred during closing. The prosecutor informed the jury: "*I* am not the United States Government. *I* do not reside in Washington, D.C. . . . This is the District Attorney and one of his assistants bring[ing] this case for the Twelfth Judicial District. That's Otero and Lincoln Counties. That's here, at home." This was a direct appeal to the sympathies and prejudices of the jury, and the prosecution continued, after inviting the jury to reenact the shooting and sit in the victim's chair, telling the jurors:

> If after looking at everything you honestly believe, and you can go home at night and sleep with the idea, that it's okay for a man to walk into another man's house and kill him while he's sitting in his easy chair watching television, if that's okay for that to take place here in either Lincoln or Otero County, if you all feel that that's okay, then that's something that we'll all live with, or die with, as the case may be. Because that's what this case comes down to.

What does any of that have to do with whether the defendant shot the victim (a) not in self-defense, and (b) with requisite premeditation? Nothing. It is again an improper attempt to inflame the jury and to avoid an acquittal at the expense of the right of the State and the defendant alike to a fair trial.

[70] The prosecutor comments on that right, then proceeds to denigrate it: "[Breit] [has a right to a trial, but he also] has the right to be found guilty. Unless it's okay for anyone to go and do that. And if it's okay, then, like I said, I guess that's something we'll [all] live with. . . ."

[71] We all have the right to remain silent. The impropriety of a prosecutor commenting on the defendant's exercise of that right is so elemental it may even be recognized by *L.A. Law.* Yet the prosecutor tells the jury: "That was the first time I [had] heard his story, and that's the way everything works. I don't get to go and ask him, 'Okay, what's your version going to be?' I hear it here, just like you do."

[72] The right to counsel was not left untouched, either. The prosecutor told the jury that "all of this [goes] to this story that was rehearsed, rehearsed, rehearsed, with six lawyers."

[73] By the time for his rebuttal argument, the prosecutor had lost all distinction between hard blows and foul ones. His first statement: "I've got a great idea. Why don't I get mad at somebody, go over and murder them, and then I'll hire six lawyers, they'll put together a case, we'll claim self-defense."

[74] The prosecutor continued with "we" and "us" throughout, which the court mistakenly characterized as probably the "imperial we" at the hearing on the defendant's motion for a new trial. A review of the transcript clearly shows the prosecutor was referring to defense counsel as well: "Let's put the police on trial." "[W]e'll hire an expert.... [W]e'll have him come in here...." "[To explain the inadequate police investigation] [w]e can even throw in a little[, 'probably because it was the poor part of town.']" "[W]e'll say it should have been turned over to the crime lab."

[75] And the remark which finally triggered an objection: "It is not up to the State to show self-defense. That is a legal theory concocted by the defendant and his lawyers to sell to you."

[76] Defendant's counsel, while stating the reasons he didn't want to ask for a mistrial, stated the defendant spent the night in jail. The prosecutor had him repeat that twice in case the jury hadn't heard it, and then said: "So what? He's going to spend a lot longer than that."

[77] Mr. Boaz's remarks at that point bear repeating, as they state the prejudice to the defendant which would be suffered by a mistrial:

This thing has been over his head all this year. The man is—it has taken such a toll on him mentally and physically that I cannot ask for a mistrial. But I think that what the State just did is reprehensible, and that curative instruction will not take away the prejudice of what he just did, accusing me and [co-counsel] Mr. Knanishu of lying and concocting some kind of story. I've never heard a district attorney do that in a final argument. I've never seen such. In fact, I've never seen this kind of conduct by a district attorney, this whole week. Like it's some kind of a big game. And then pointing a finger and calling us liars and concocting stories, I just can't believe it's happening.

[78] His remarks had no effect on the prosecutor, who continues his discussion of the victim's testimony, and proceeds with:

I didn't make up the story about the banks. That's not *my* doing[. *I* ] didn't make up the story about snakes, *I* didn't make up a story about where he went hunting, *I* didn't make up that story. *I* didn't make up any of this. *I* never spoke with the guy before. We all got to hear that story at the same time.

[79] And although it is clear that the prosecutor did not refer to defense counsel when he said, "What a liar. What an absolute, appalling, filthy liar," at the end of his scenario he has the defendant thinking:

"I've just murdered somebody. I've got to get the hell out of there, now." And what's the first thing he does? Contacts a lawyer. "I've got to get out. And I mean, I am in trouble. What are we going to do?" I love it.

[80] A few minutes later, at the bench, the prosecutor says to defense counsel: "You wave that at me one more time, sweetheart—," which the court specifically finds was an unprovoked remark.

[81] The prosecutor continues to paint defense counsel as accomplice to perjury:

And then to sit there and say, "Oh, by the way, we don't have to prove a thing." Well, they don't. They don't. You can sit back and you can watch the evidence that we put on. And that's fine. [And that's fine.] That's fine with me. But you can also look at the absurdity of this fantasy being woven in front of you....

....

It's absolutely amazing. It's absolutely amazing. I mean, it's—this guy murders somebody, cooks up a story, and then they come in here and say, "Whoops. We've got an eye witness. First thing we better do is put the eye witness on trial." That way the jury doesn't think about you, Breit. What they're going to think about

is the eye witness. Who is on trial here, that's the question, and that's what it boils down to. I mean, whose idea was it to cook up a story of self-defense?

[82] Counsel for the State needs also to be reminded that his personal belief in the guilt of the defendant, the veracity of the witnesses, the competency and honesty of opposing counsel are absolutely irrelevant, and have no place *at any time* in a courtroom and *cannot* be stated or implied. To cite all the violations of this particular standard would require more time and energy than the court has.

[83] A new trial was earlier granted on the basis of impermissible comments on the defendant's right to counsel. The court must now decide whether the defendant, having once been put in jeopardy for this offense, would be subject to double jeopardy were he to be retried.

[84] The court does not believe that the prosecutor wanted a mistrial in this case. This is evidenced not only by the very arrogance with which the trial and the closing were conducted, but also by the State's acquiescence to a proposed plea agreement after a new trial was ordered under which the defendant would plea no contest to second degree murder, firearm enhancement, get credit for time served, serve the sixty days or so remaining on the mandatory enhancement, and then be put on probation for the rest. The State, it is true, would not publicly agree to the deal but would not oppose a prior understanding with the court that probation would be the result of the plea.

[85] Avoiding [an] acquittal, however, must mean something more than provoking a mistrial for the purpose of avoiding an acquittal and of course, must go far beyond the ordinary prosecutorial role of obtaining a conviction. In this case, the evidence as to premeditation was slim. The claim of self-defense, moreover, rested entirely upon the defendant's own testimony. By destroying the credibility of the defendant and his counsel through unfair, unethical and constitutionally impermissible trial tactics, the prose-

cutor was attempting to avoid an acquittal at any cost.

[86] This is not a happy opinion for the court to write. It was a trial out of control. It is the *court's* function to control the course of trial, and although amiable warnings have generally been successful in the past, it should have been clear much earlier that the court's usual and ordinary methods of controlling the conduct of counsel is effective only where there is an underlying respect for our system of justice on counsel's part. Clearly, that was lacking in this case. Clearly, the court should have admitted that sooner, and applied much more punitive measures. A mistrial early on would have wreaked havoc on the court's calendar and budget and in the lives of counsel and litigants, but not so much as allowing the case to continue in the manner in which it did.

[87] The prosecutor's conduct and the court's failure to adequately control it deprived the defendant (and the State of New Mexico) of a fair trial in this case. The prosecutor's conduct was intended to prevent an acquittal, and due to many factors, including the state of defendant's health, a new trial will not adequately cure the prejudice.

[88] I reluctantly conclude that the defendant's constitutional right to not be put twice in jeopardy for the same offense would be violated by retrying this case. The defendant's motion will be granted. Ten days will be allowed for proposed findings and conclusions; Messrs. Foy and Boaz will be responsible for drafting the Order.

[89] The court has a copy of the ABA *Standards* relating to prosecutorial functions. [*See* I American Bar Association, *Standards for Criminal Justice, The Prosecutorial Function* ch. 3 (1980).] The behavior which resulted in this decision is easily avoided, and I would be more than happy to give a copy of the *Standards* to counsel requesting same.