2007-NMCA-054

159 P.3d 1108

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Hector CORTEZ, Defendant–Appellant.**

No. 25,406.

Court of Appeals of New Mexico.

Feb. 22, 2007.

Certiorari Granted, No. 30,288,
May 11, 2007.

Gary K. King, Attorney General, Santa Fe, NM, Jacqueline R. Medina, Assistant Attorney General, Albuquerque, NM, for Appellee.

John Bigelow, Chief Public Defender, Cordelia A. Friedman, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

## OPINION

SUTIN, Chief Judge.

{1} Defendant Hector Cortez appeals his convictions relating to trafficking cocaine. He asserts error because, in response to a note from the jury expressing an inability to reach a verdict and revealing the numerical division with nine for conviction and three against, the district court spoke to the foreperson of the jury without the rest of the jury present, soon after which the jury returned a verdict of guilty. We reverse, holding that the procedure and communication constituted fundamental error. Defendant also raises issues regarding the State's failure to disclose evidence relating to the State's main witness, which, in turn, allowed the State to unfairly bolster the witness' credibility. We hold that the prosecutorial misconduct alleged does not bar a retrial of Defendant.

## DISCUSSION

{2} A full recitation of the events leading up to Defendant's arrest is unwarranted, given that those events are not particularly important in regard to the jury communication or prosecutorial misconduct issues that we must address. Arturo Reynaga arranged to sell cocaine to an undercover police officer. When he proceeded to the meeting place for the sale, he was arrested. He quickly agreed to assist the police in pursuing Defendant's arrest because, according to Reynaga, Defendant was the supplier of the cocaine. Defendant was ultimately arrested and convicted of drug-related crimes in connection with this drug deal.

### I. The Jury Communication Issue

### A. The Circumstances

{3} During jury deliberations, the district court received a note from the jury. With Defendant and all counsel present, the court

read the note. Signed by the foreperson, the note read, "The jury could not reach an [sic] unanimous decision on either case; jury split 9 votes guilty—3 votes undecided." Proposing to ask the foreperson "if there would be any benefit to the jury continuing onward," the court had the foreperson come out. The following exchange between the court and the foreperson occurred in the presence of Defendant and all counsel but not in the presence of the jury:

THE COURT: Mr. Greer, I understand you are the foreperson. I have your note, and my question is at this point do you think there is any chance of it being fruitful if you continue to deliberate, not without further instructions or without some more evidence to be considered.

THE FOREPERSON: We've gone around the table and the same individuals feel that they haven't received enough evidence in this case.

THE COURT: So it is really a question of further evidence.

THE FOREPERSON: It seems to me that is the case, yes, sir.

THE COURT: [I] said instructions a moment ago. Would instructions be something different than evidence, in your view?

THE FOREPERSON: If there was some way you could, if there was some set of instructions, and I don't know what it would be, that you could give us, that would allow us to have a fresh perspective to allow people to reexamine their opinions, to reexamine the facts, the evidence in this case and/or just to discuss it one more time, perhaps it will be fruitful to discuss it one more time, but right now everybody, being the people who are not agreeing to the decision, are pretty confirmed in their opinions.

THE COURT: Well, this is what I would ask you to do. I would ask you to read the instructions and consider the matter after you have read the instructions together, and let me know at that point. I don't want to force you to do anything if it is not going to be fruitful, but I do want you to read the instructions to the jury together, and then discuss it again and see where you end up.

THE FOREPERSON: Yes, your Honor.

THE COURT: We'll wait until, take as much time as you need, but if you feel it is not fruitful at that point or not going to be fruitful, then let us know.

THE FOREPERSON: Yes, your Honor.

THE COURT: All right, we'll be in recess.

{4} After the foreperson left the courtroom, the court asked those present if there was anything further anyone wanted to address. Defendant did not object to the procedure used by the court or to the communications between the court and the foreperson. The next matter in court was the jury's unanimous verdict of guilty. The record does not reflect how long the jury was deliberating, either before or after the note to the court. Defendant raised no question regarding the verdict before or after the jury was polled and then released. On appeal, Defendant contends that it was fundamental error for the court not to have declared a mistrial after being informed of the deadlock and numerical breakdown, and for the court to have communicated with the foreperson as occurred here.

## B. Standard of Review

{5} Fundamental error is an exception to the rule that parties must preserve issues for appeal. Rule 12–216(A), (B)(2) NMRA; *State v. Cunningham*, 2000–NMSC–009, ¶ 10, 128 N.M. 711, 998 P.2d 176. Appellate courts are to exercise discretion to review an assertion of fundamental error only in rare instances and solely to prevent a miscarriage of justice where some fundamental right has been invaded. *State v. Reyes*, 2002–NMSC–024, ¶¶ 41–42, 132 N.M. 576, 52 P.3d 948; *Cunningham*, 2000–NMSC–009, ¶ 12, 128 N.M. 711, 998 P.2d 176. To rise to the level of fundamental error, the error must go "to the foundation or basis of a defendant's rights or must go to the foundation of the case or take from the defendant a right which was essential to his defense and which no court could or ought to permit him to waive." *Cunningham*, 2000–NMSC–009,

¶ 13, 128 N.M. 711, 998 P.2d 176. "[N]ot all questions of fundamental error turn solely on guilt or innocence" of the defendant. *State v. Barber*, 2004–NMSC–019, ¶ 14, 135 N.M. 621, 92 P.3d 633. There are circumstances under which our focus should be "more on process and the underlying integrity of our judicial system." *Id.* ¶ 16. We will "not uphold a conviction if an error implicate[s] a fundamental unfairness within the system that would undermine judicial integrity if left unchecked." *Id.* ¶ 18 (internal quotation marks and citation omitted).

## C.  Asserted Error

{6} Defendant's assertion of fundamental error is based on a breach of the sanctity of jury deliberations. A breach that occurred, Defendant argues, through (1) the court's refusal to accept the three hold-out jurors' votes and the jury's decision to hang; (2) the court's forbidden "shotgun" instruction to the foreperson that responded coercively to the jury's note indicating its inability to reach a unanimous decision; and (3) the court's procedure that left to speculation what the foreperson said to the jury, raising a presumption of prejudice that was not rebutted by the State.

{7} Defendant argues that the error is fundamental in that it attacks the heart of the jury deliberation process, a process that is "sacrosanct." *See State v. Ramming*, 106 N.M. 42, 49, 738 P.2d 914, 921 (Ct.App.1987) (stating that New Mexico cases relating to communications with the jury during deliberations and involving matters concerning the deliberations "obviously reflect the sacrosanctity of the jury's deliberative process"); *see also State v. Jojola*, 2006–NMSC–048, ¶¶ 4–6, 140 N.M. 660, 146 P.3d 305 (confirming that a presumption of prejudice to the rights of a defendant arises on the showing of an improper communication to the jury); *State v. McCarter*, 93 N.M. 708, 710–11, 604 P.2d 1242, 1244–45 (1980) (stating that a coercive instruction "violates due process because it impinges on the right to a fair and impartial trial"), *limited on other grounds by State v. Baca*, 114 N.M. 668, 672, 845 P.2d 762, 766 (1992).

## D.  Shotgun Instructions Are Prohibited

{8} A "shotgun" instruction is prohibited in New Mexico. *McCarter*, 93 N.M. at 711, 604 P.2d at 1245; *see State v. Travis*, 79 N.M. 307, 308–09, 442 P.2d 797, 798–99 (Ct. App.1968); *see also* UJI 14–6030 NMRA (setting out a shotgun instruction and stating in the use note that "[n]o instruction on this subject shall be given"); *Jojola*, 2006–NMSC–048, ¶ 11, 140 N.M. 660, 146 P.3d 305 (referring to UJI 14–6030 and its use note, and stating that "[s]ince at least 1980 [t]his court has specifically prohibited the use of such instructions, recognizing that they have been held to be coercive" (internal quotation marks and citation omitted) (second alteration in original)).

{9} In *McCarter*, our Supreme Court held that the district court's note to the jury stating "You must consider further deliberations" following a note from the jury stating "We are at a decision of eleven to one for murder" was "tantamount to a simplified shotgun instruction." 93 N.M. at 710, 604 P.2d at 1244. Indicating that the court "can inform the jury that it *may* consider further deliberations, but not that it *must* consider further deliberations," the Court held the instruction given was coercive, in that it essentially became a lecture to the lone juror who does not favor conviction, violating due process because it impinged on the right to a fair and impartial trial. *Id.* at 710–11, 604 P.2d at 1244–45.

## E.  Application of *Jojola* to Jury Communication

{10} *Jojola* involved ex parte communication between the trial judge and the jury foreperson without the defendant or any counsel present. 2006–NMSC–048, ¶¶ 1–2, 140 N.M. 660, 146 P.3d 305. Among other exchanges, the district court was told by the foreperson that another juror indicated she would not vote to convict, and in response, the court told the foreperson, "to continue and do whatever she had to do and just report . . . and I could handle it from there," and, further "just report that you are hung" and "I'll take it from there." *Id.* ¶ 2. In less than an hour, the defendant was convicted by a unanimous jury. *Id.* ¶ 1.

{11} On appeal, our Supreme Court in *Jojola* addressed whether the communication was improper because it was ex parte and was therefore presumptively prejudicial. The Court held that the communication was improper and that the State failed to rebut the presumption of prejudice, requiring reversal. *Id.* ¶¶ 6, 12–13. Among the various points emphasized by the Court was Rule 5–610(D) NMRA, which states that "[a]ll communications between the court and the jury must be in open court in the presence of the defendant and counsel for the parties unless the defendant waives on the record the right to be present or unless the communication involves only a ministerial matter." *Jojola*, 2006–NMSC–048, ¶ 7, 140 N.M. 660, 146 P.3d 305; *see also McCarter*, 93 N.M. at 711, 604 P.2d at 1245 (requiring communications with the jury concerning the subject matter of the proceedings to be in open court and in the presence of the accused and his counsel); *Hovey v. State*, 104 N.M. 667, 669, 726 P.2d 344, 346 (1986) (same). *Jojola* gave further emphasis to the requirement that a proper record be made of the communication with the jury. 2006–NMSC–048, ¶¶ 8–9, 140 N.M. 660, 146 P.3d 305.

{12} In elaborating on its rationale for reversal, our Supreme Court in *Jojola* stated that a "primary concern" was that "having one juror [the foreperson] serve as a conduit for communicating instructions to the whole panel" created an unacceptable risk that the juror will not accurately convey the message to the jury. *Id.* ¶¶ 10, 11 (internal quotation marks and citation omitted). The Court recognized that: "[A]ny occasion which leads to communication with the whole jury panel through one juror inevitably risks innocent misstatements of the law and misinterpretations despite the undisputed good faith of the participants." *Id.* ¶ 10 (internal quotation marks and citation omitted). Additionally, the Court stated that "we are left to speculate about how the juror interpreted the judge's comments and gestures and about what the juror reported to the rest of the jury back in the jury room." *Id.* ¶ 11. Notably, and equally important for the issue before us in the present case, the Court in *Jojola* stated:

The juror may have interpreted the judge's statement to "do whatever [you have] to do" as an ultimatum to reach a verdict and may have relayed such an ultimatum to the rest of the jury. If so, the juror, inadvertently for sure, might have done what the judge would never have done—issue a so-called "shotgun" instruction. The use note for this instruction provides: "No instruction on this subject shall be given." UJI 14–6030.

*Id.* The procedure and communication of the district court in *Jojola* "concerned the jury's deliberations and the inner workings of the jury room and the jurors' view of the evidence," creating an impropriety even "if the juror did not issue a shotgun instruction to the rest of the jury." *Id.* ¶ 12 (internal quotation marks and citation omitted).

{13} We read *Jojola* to make two intertwined determinations. One, the communication was ex parte, and because it concerned the jury's deliberations and the inner workings of the jury room and the jurors' view of the evidence, it was improper and presumptively prejudicial, requiring the State to rebut the presumption of prejudice. And two, with the specific communication, the process itself was improper and also presumptively prejudicial because what was ultimately communicated to the jury by the foreperson was not in writing and placed of record, and because our Supreme Court could only speculate about what the foreperson told the jury and whether the jury interpreted the district court's words as a desire on the part of the court for the jury to reach a verdict.

{14} Although in the present case all counsel and Defendant were present during the proceedings, we think that the procedure and communication constituted error. Under the specific circumstances in the present case, we hold that the error was fundamental error. The communication with the foreperson specifically concerned the subject matter of the jury count arrived at in the jury deliberations. The court did not, as required under Rule 5–610(D), communicate in open court with the jury. We are therefore unaware of what was ultimately communicated to the jury by the foreperson. The court was informed by the foreperson that

the jury's vote count was nine guilty to three undecided. The court was informed by the foreperson that the hold-outs had not received enough evidence. Upon prompting by the court, the foreperson also inquired if there were instructions the court could give to allow the jury "to have a fresh perspective to allow people to reexamine their opinions, to reexamine the facts, the evidence in this case and/or just to discuss it one more time ... [in that] everybody, being the people who are not agreeing to the decision, are pretty confirmed in their opinions." The court told the foreperson to read the jury instructions together and discuss it again. This might have signaled to the foreperson, or to the jury through the foreperson's interpretation of what the court said, that the jury was to reach a verdict. The jury presumably was aware, through the foreperson's note given to the court, that the court knew of the jurors' inability to reach a unanimous decision and also knew of the specific vote count. Thus, even were we to assume that all the foreperson stated to the jury was to "read the instructions together" and then to "discuss it and see where [we] end up," it would not be unreasonable, under the circumstances, for the three undecided votes to think that the court was looking to them to change their votes. The court's statements in *Smith v. United States*, 542 A.2d 823 (D.C.1988), regarding the risk accompanying these circumstances is in accord with the risk recognized in *Jojola:*

> There is inevitably a risk of coercion whenever a jury is divided unevenly. Any effort by the court to persuade the jury to reach an agreement after reporting its numerical split ... may be interpreted by the minority as an implied command to agree with the majority....
>
> ...
>
> ... If the jury reasonably believes that the judge knows how it is divided, regardless of the judge's actual knowledge, *any* pressure by the judge to reach a verdict ... will be understood by all jurors to be directed at the minority.

*Smith*, 542 A.2d at 824–25 (citations omitted).

■ {15} The jury deliberation process on guilt or innocence is sacrosanct. Its in-violability must be carefully respected and maintained to guard against the risk of denying a defendant a fair trial. The judge and parties are forbidden entry to the jury room deliberations. However, other aspects of the jury deliberation process are to be transparent and written or recorded, including, in particular, all communications that the jury receives from the court, and all communications that the court receives from a juror or the jury. Where guilt or mistrial hang in the balance in the jury room as it did in this case, we do not think that the question of fundamental error should turn on an assessment on review of the guilt or innocence of Defendant. Rather, it turns on the fairness of the process of the judicial system.

■ {16} The State asserts that *State v. Neely*, 112 N.M. 702, 819 P.2d 249 (1991), requires us to reject Defendant's arguments. In *Neely*, a first degree murder case, after several days of deliberation, the jury stated it was deadlocked. *Id.* at 703, 712, 819 P.2d at 250, 259. With defense counsel and the defendant present, the district court "proposed to ask the foreperson whether further deliberations would assist in reaching a verdict." *Id.* at 712, 819 P.2d at 259. As stated in *Neely's* brief discussion of the issue, the "[d]efense did not object, the court asked the foreperson, and she responded affirmatively. The jury returned its verdict shortly thereafter." *Id.* Our Supreme Court held that the district court's instruction "accorded with this court's direction in *State v. McCarter*," determining that a court "not only can, but should, communicate with the jury and can do so if the communication leaves with the jury the discretion whether or not it should deliberate further." *Neely*, 112 N.M. at 712, 819 P.2d at 259 (internal quotation marks and citation omitted). We do not think *Neely* requires a different result than that which we reach under the specific circumstances in the present case. In *Neely*, the district court was not told of the numerical division. *See id.* In addition, no issue appears to have been raised in regard to the impropriety of the court's having spoken only to the foreperson before the jury continued its deliberations. *See id.* Cases are not precedent for issues not raised and decided. *See State v.*

*Rodarte,* 2005–NMCA–141, ¶ 18, 138 N.M. 668, 125 P.3d 647. Further, the district court's words in the present case cannot be construed as ones that "[left] with the jury the discretion whether or not it should deliberate further." *Neely,* 112 N.M. at 712, 819 P.2d at 259 (internal quotation marks and citation omitted).

{17} The standards for holding that fundamental error exists are met under the specific facts in this case, namely, that the jury was aware the court knew the hold-out juror count, and that it is unknown what the foreperson relayed to the jury. The communication and procedure left too much to chance and speculation. There was too much of a possibility of foreperson misstatement to the jury, and too much of a possibility of hold-out juror interpretation and belief that the court wanted the jury to return a verdict, thereby invading a defendant's right to a fair trial by interfering with the "sacrosanct" jury deliberation process. Under such circumstances, a trial court must take every precaution to refrain from any communication or procedure that can give the jury a sense that the court wants it to reach a verdict instead of report an inability to reach a unanimous verdict. *See Smith,* 542 A.2d at 825 ("The judge must take special care not to put undue pressure on the minority jurors."). In our view, the lack of caution as to communication and procedure in the present case caused miscarriage of justice and fair trial concerns that reached a level requiring the application of fundamental error.

{18} Our fundamental error holding in this case is a narrow one confined to circumstances in which the jury, through the foreperson or a note, informs the court of its numerical split, with a minority favoring a not-guilty verdict, and the court's instruction to the jury in regard to further deliberations is not in open court, is oral, and is carried out through the foreperson who returns to the jury room and orally relays the court's instruction to the jury. Our fundamental error holding is not intended to apply to court communications with the foreperson alone in regard to matters that do not create the risk of coercion that exists in the present case, where error in communication should first be addressed in the district court through appropriate objection.

## II. Withheld Evidence and Prosecutorial Misconduct

{19} Police officers in this case first came into contact with Reynaga through a confidential informant. Unbeknownst to the defense before or during trial because the State withheld the information, with the help of a confidential informant, the officers attempted to purchase cocaine from Reynaga on two occasions before the successful transaction that gave rise to Reynaga's arrest. Nor was the defense made aware that Reynaga's cousin was involved in some manner with Reynaga during an unsuccessful attempt to purchase cocaine near the furniture store where Reynaga worked.

{20} During direct examination at trial of Reynaga, the following colloquy occurred.

Q. [Prosecutor] Let me ask you this, is this the first time you had ever done a drug deal with the defendant?

A. Yes, sir.

Q. The first time you ever did a drug deal, period?

A. Yes, sir.

{21} During the direct examinations at trial of the officers involved, neither mentioned the earlier attempted drug transactions from Reynaga. Then during closing argument the prosecutor argued:

[Reynaga's] kind of taking a risk here too, but you heard him testify. He has no criminal history that has been submitted, he's testified he has never had any criminal problems, this is [the] first time he's been involved with drugs. Whether you believe him or not, that's up to you, but that's the evidence, there's no evidence contrary to that. The defense did not put up anything, and they didn't have to.

{22} After the verdict, the court expressed its curiosity about how Reynaga, a co-conspirator who appeared to have no record and had not been involved in prior drug dealings, was contacted by the police for the possible sale of cocaine. Thinking that the information had sentencing implications, the court arranged for in-camera interviews with the

undercover officers to learn how Reynaga came to be involved. The interviews brought to light the prior, uncompleted drug transactions involving Reynaga that occurred within a few weeks of the completed drug deal that resulted in Reynaga's arrest.

{23} Defendant complains of the State withholding evidence material to his defense. We note that, in this case, Defendant made a demand for discovery and the district court entered a discovery order that required the State to provide to Defendant the discovery specified in Rule 5–501 NMRA. Rule 5–501(A)(3) and (6) require the State to disclose or make available to a defendant any documents or papers that are material to the preparation of the defense and "any material evidence favorable to the defendant which the [S]tate is required to produce under the due process clause of the United States Constitution." *See State v. Trujillo,* 2002–NMSC–005, ¶ 50, 131 N.M. 709, 42 P.3d 814 (stating that under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the State has an affirmative duty to disclose that which is required to be disclosed under Rule 5–501(A)(6)). We further note that the State failed to alert Defendant to the existence of the prior, unsuccessful drug transactions, failed to disclose any evidence relating to them, and failed to assert any privilege under Rule 11–510(A) NMRA in regard to that evidence. The State in fact concedes that it withheld information regarding the prior, unsuccessful attempts to purchase drugs from Reynaga.

{24} Defendant argues that the State committed prosecutorial misconduct through a combination of actions and failures to act. Defendant starts with the assertion that the State withheld exculpatory evidence, namely, the prior, unsuccessful drug transactions and the cousin's potential involvement, in violation of the Due Process Clause of the United States Constitution under the standard announced in *Brady,* 373 U.S. at 87, 83 S.Ct. 1194, that requires the prosecution to disclose evidence that is material to the defense. Defendant points out that the testimony of Reynaga and the officers, together with the prosecutor's closing remarks, bestowed upon Reynaga a "false cloak of credibility," with

Defendant having no basis on which to question the testimony or to rebut the prosecutor's argument. Defendant charges that the prosecutor pursued Reynaga's testimony of no prior drug deals and then acknowledged that testimony in final argument while intentionally and carefully hiding from Defendant and otherwise omitting any reference to the prior, unsuccessful transactions. Further, Defendant contends that the evidence of his involvement as a supplier was weak at best, dependent almost entirely on Reynaga's statements to the police, and that evidence of Reynaga's cousin's involvement would have supported a defense theory that it was the cousin, not Defendant, who was the supplier of the cocaine in question, thus raising reasonable doubt in the jury's mind whether Defendant was the supplier. Defendant adds that, by withholding the material evidence, the State deprived him of his right to confront Reynaga about his earlier drug transaction involvements and to challenge Reynaga's credibility. *See Crawford v. Washington,* 541 U.S. 36, 38, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

{25} In sum, Defendant asserts that the prosecutor's conduct evinced "a willful disregard for any consequences for the discovery violation and the inaccurate or perjured testimony" and was sufficiently egregious to bar his retrial under *State v. Breit,* 1996–NMSC–067, 122 N.M. 655, 930 P.2d 792, which holds that jeopardy can attach at trial under certain circumstances of prosecutorial misconduct. Alternatively, Defendant asserts that "the individual acts of misconduct either individually or in the aggregate denied [him] his constitutional rights to confront the witnesses against him, due process of law, and a fair trial warranting a reversal of the convictions ... and a remand for a new trial."

{26} Because we are reversing based on the error involving the improper jury communication, we need address only whether the prosecutor's conduct was sufficiently egregious to bar a retrial under the standard in *Breit.* If the conduct did not meet the *Breit* threshold, any possible lingering discovery and confrontation issues that are not now moot but remain unsettled can be raised and resolved on remand.

{27} In defending against Defendant's charges of prosecutorial misconduct, the

State argues that it was not required to disclose the evidence in question because Rule 5–501(F) provides a disclosure duty exception if the disclosure will expose a confidential informant, and Rule 11–510(A) grants the State a privilege to refuse to disclose the identity of a confidential informant. In defending against Defendant's contention that *Breit* bars a retrial because of the egregious nature of the prosecutor's conduct, the State argues that, while the information regarding the failed attempts was withheld, the information was neither favorable to Defendant nor was it material.

■ {28} It appears to us that the prosecution in this case had a duty to bring to Defendant's and the district court's attention that it had information that arguably came within the court's discovery order and the *Brady* rule. It appears that the State breached that duty. It also appears that if the prosecution was not going to disclose any of the information, it had a duty to assert the Rule 11–510(A) privilege. It appears that the State breached that duty as well. *See State v. Luna*, 1996–NMCA–071, ¶¶ 9–14, 122 N.M. 143, 921 P.2d 950 (indicating that the State should assert its privilege in a timely manner to allow the defendant to seek in-camera review of allegedly privileged documents). Knowing of the prior attempts to purchase cocaine from Reynaga and withholding from Defendant even just the fact that prior attempts to purchase were made, and that one also involved Reynaga's cousin, it would appear that it was improper for the prosecutor to elicit Reynaga's testimony that the current drug deal was "the first time [he] ever did a drug deal, period," and to then argue to the jury that "this is [the] first time he's been involved with drugs" for the purpose of bolstering Reynaga's credibility.

{29} We assume, without deciding, that the prosecutor's conduct constituted prosecutorial misconduct, and, for the reasons we discuss later in this opinion, we determine that the conduct did not meet the *Breit* threshold.

■ {30} Prosecutorial misconduct occurs when "the prosecutor's improprieties had such a persuasive and prejudicial effect on the jury's verdict that the defendant was

deprived of a fair trial." *State v. Duffy*, 1998–NMSC–014, ¶ 46, 126 N.M. 132, 967 P.2d 807. Jeopardy attaches and retrial is barred:

when improper official conduct is so unfairly prejudicial to the defendant that it cannot be cured by means short of a mistrial or a motion for a new trial, and if the official knows that the conduct is improper and prejudicial, and if the official either intends to provoke a mistrial or acts in willful disregard of the resulting mistrial, retrial, or reversal.

*Breit*, 1996–NMSC–067, ¶ 32, 122 N.M. 655, 930 P.2d 792. We see no indication in the present case of prosecutorial intent to provoke a mistrial and Defendant does not suggest as much. The issue is whether the prosecutor's conduct was so unfairly prejudicial to Defendant that it could not be cured by means short of a mistrial or a new trial, and whether the prosecutor acted in willful disregard of a resulting mistrial, retrial, or reversal.

{31} The Supreme Court defined "willful disregard" as connoting "a conscious and purposeful decision by the prosecutor to dismiss any concern that his or her conduct may lead to a mistrial or reversal," and as "emphasizing that the prosecutor is actually aware, or is presumed to be aware, of the potential consequences of his or her actions." *Id.* ¶ 34. It is evident that our Supreme Court in *Breit* intended the threshold of willful disregard to be high, as evidenced by the Court's statements that "double jeopardy will rarely bar reprosecution if the misconduct is an isolated instance during the course of an otherwise fair trial," that "[r]aising the bar of double jeopardy should be an exceedingly uncommon remedy," and that the test was intended to be a "narrow expansion" of the more restrictive federal standard established in *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). *Breit*, 1996–NMSC–067, ¶¶ 3, 16, 33, 35, 122 N.M. 655, 930 P.2d 792. Specifically, *Kennedy* adopted a narrow rule that "restrict[ed] the bar against retrial exclusively to those situations in which the prosecution intentionally 'goads' the defendant into moving for a retrial." *Breit*, 1996–NMSC–067, ¶ 2, 122 N.M. 655, 930 P.2d 792. In addition, we note that our Supreme Court in *Breit* applied the bar

of double jeopardy based on the trial court's findings that showed "the pervasive, incessant, and outrageous nature of the prosecutor's misconduct during [the defendant's] first trial," and also based on the trial court's conclusion that the trial was "out of control." *Id.* ¶¶ 37, 41. Further, it appeared from the trial court's memorandum opinion that the state destroyed the defendant's credibility "through unfair, unethical and constitutionally impermissible trial tactics." *Id.* ¶ 85.

{32} We look at the totality of circumstances in evaluating the prosecutor's conduct. *Id.* ¶ 40. We must be careful that the citizens of New Mexico are not, without exceptionally good reason, "deprive[d] . . . of their case" against a defendant, particularly when the prejudice to the defendant can be rectified by a new trial that will be free from the prejudice. *State v. Day,* 94 N.M. 753, 757, 617 P.2d 142, 146 (1980).

{33} The conduct in question consisted of the withholding by the State of any indication of and information about the two attempted, unsuccessful drug transactions involving a confidential informant, followed, at trial, with the eliciting of testimony from Reynaga that appears to have denied any such involvements on Reynaga's part, and then the prosecutor's closing argument to the jury bolstering Reynaga's credibility. In considering the totality of circumstances, we determine that Defendant has failed to make a persuasive case for a re-prosecution bar.

{34} While we by no means condone the prosecutor's conduct, we are unable to conclude that the prosecutor's decision to withhold information regarding the two attempted drug transactions was part of or based on any plan to present questionably accurate testimony and bolster Reynaga's credibility in closing argument. Nor are we prepared to conclude that withholding the information, along with Reynaga's testimony and the prosecutor's closing argument, when considered together, constituted an infestation of prejudicial conduct rather than an isolated instance during what was otherwise a fair trial. *See State v. Fielder,* 2005–NMCA–108, ¶ 23, 138 N.M. 244, 118 P.3d 752 (holding that a lone instance of prosecutorial misconduct did not rise to the level of misconduct articulated in *Breit* ); *State v. Pacheco,* 1998–NMCA–164, ¶¶ 11–15, 126 N.M. 278, 968 P.2d

789 (holding that a comment on the defendant's silence, even though a clear violation of law requiring a mistrial, was insufficient to reach the *Breit* bar prohibiting retrial).

{35} As we read and understand *Breit,* the re-prosecution bar under the willful-disregard test is to be invoked only in rare instances when it can be shown that there exists an actual or presumed awareness by the prosecutor of the potential consequences of his or her actions together with a conscious and purposeful decision to dismiss any concern that the conduct may lead to a mistrial or reversal. *See Breit,* 1996–NMSC–067, ¶ 34, 122 N.M. 655, 930 P.2d 792. In the present case, Defendant has not sufficiently shown that circumstances exist and meet the *Breit* test.

## CONCLUSION

{36} We reverse Defendant's convictions on the ground of improper juror communication. We hold that retrial of Defendant is not barred under double jeopardy principles.

{37} **IT IS SO ORDERED.**

WE CONCUR: LYNN PICKARD and MICHAEL D. BUSTAMANTE, Judges.